**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

JACOB SANCHEZ,

    Plaintiff,

v.                No. CIV 19-0196 RB/CG

ISAIAH BAKER, in his individual capacity,
JOHN DOES I–V, in their individual capacities,
and THE CITY OF LAS CRUCES,

    Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

   One night in 2017, Plaintiff Jacob Sanchez sped down a city street, attracting the attention

of Las Cruces Police Department (LCPD) Sergeant Joshua Savage, who attempted to make a traffic

stop. Sanchez sped away from Savage, crashed his vehicle, and fled on foot. Savage called for

assistance, and Officer Isaiah Baker responded with his police dog. Baker spotted Sanchez and

ordered him to surrender. Sanchez realized that he could not evade arrest, and he slowly walked

toward Baker to surrender. While Sanchez was not suspected of a serious crime, was not known

to be armed or a safety threat, and was in the act of surrendering, Baker released his police dog to

apprehend Sanchez, who bit and held him for over 30 seconds, causing serious injury.

   Sanchez now brings claims for excessive force and municipal liability under 42 U.S.C.

§ 1983; a claim for excessive force under Article II, section 10 of the New Mexico Constitution;

and claims for negligent use of equipment, battery, and negligent retention under the New Mexico

Tort Claims Act, N.M. Stat. Ann. §§ 41-4-6 and 41-4-12 (1978) (NMTCA). In this Opinion, the

Court finds that: (1) Baker committed excessive force in violation of clearly established law and

thus denies Baker qualified immunity or summary judgment on the excessive force and battery

claims; (2) Sanchez has not set forth evidence to create a genuine dispute of fact on his municipal liability and negligent retention claims and thus grants summary judgment to the City; and (3) Sanchez fails to allege facts sufficient to maintain the negligent use of equipment claims.

## I.      Statement of Facts[1]

Around 10:30 p.m. on May 5, 2017, Sergeant Savage saw a black pick-up truck that appeared to be speeding. (Doc. 29-1 ¶¶ 3–5.) Savage activated his emergency lights and attempted to initiate a traffic stop, but the truck turned "into a residential area at a speed that appeared to be well over the speed limit." (*Id.* ¶¶ 6–7; *see also* Doc. 29-2-a (Griggs_Del_Monte (1)) ("Savage Lapel Video") at 00:31–00:50.) Savage called the license plate into dispatch and cancelled the pursuit, because he "had no reason to believe that the driver had committed a serious crime to justify a high-speed pursuit into a residential area . . . ." (Doc. 29-1 ¶ 8; *see also* Savage Lapel Video at 00:52–1:06.) Within a matter of seconds, though, Savage saw the truck run a stop sign and crash into a concrete wall. (*See* Doc. 29-1 ¶¶ 9–10; Savage Lapel Video at 1:08–1:09.) He called the accident into dispatch and stopped his vehicle near the truck. (Doc. 29-1 ¶ 10; Savage Lapel Video at 1:09–1:24.)

Sanchez, the truck's driver, exited the truck and ran away from Savage by climbing the barbed wire fence of a Doña Ana County facility, despite Savage's command for Sanchez to stop. (Docs. 29-1 ¶ 11; 37-3 ¶ 2; Savage Lapel Video at 1:20–1:44.) Savage called out his position over the police radio, provided a description of the driver, stated that the driver "was running northwest towards the nearby Las Cruces Police Academy" at 300 North Hermosa Street (the Academy), and

---

[1] In accordance with summary judgment standards, the Court recites all admissible facts in a light most favorable to Sanchez. Fed. R. Civ. P. 56; *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The facts are undisputed unless noted.

requested officer assistance. (Doc. 29-1 ¶ 12; Savage Lapel Video at 1:31–2:20; *see also* Doc. 29 at 2.) Baker, who was approximately 0.3 miles[2] from the Academy at the Las Cruces Police fuel pumps at 1501 East Hadley Avenue, heard Savage's call and drove toward the Academy to assist. (*See* Doc. 29-3 ¶¶ 6–11.) As Baker approached, he saw a large group of people at the Harty Athletic Complex baseball fields located 0.3 miles northeast of the Academy by road, and about half that distance as the crow flies.[3] (*Id.* ¶ 10.) Baker arrived at the Academy ready to intercept Sanchez and set up a perimeter when he saw Sanchez on a large berm behind the Academy. (Docs. 29-3 ¶ 11; 37-3 ¶ 4.) Baker crouched behind his police vehicle and drew his firearm while he considered how to best contain Sanchez. (Doc. 29-3 ¶ 14.)

Baker repeatedly commanded Sanchez "to come out with his hands up" and warned him that he would deploy his K-9 Unit (Zeke) to apprehend and bite Sanchez if he failed to comply.[4] (*Id.* ¶¶ 15, 19, 23–24.) Sanchez shouted "F--- you!" to Baker. (*Id.* ¶ 20.) Although Sanchez asserts

---

[2] Based on the undisputed facts that Baker was at 1501 East Hadley Avenue and that the Academy is located at 300 North Hermosa Street (*see* Docs. 29 ¶¶ 6, 8; 37 ¶ 6), the Court takes judicial notice of the distance between the two addresses based on Google Maps data. *See Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013).

[3] Baker stated in his affidavit that he "saw a baseball game going on across the street at Harty Fields with a large group of people." (Doc. 29-3 ¶ 10.) Again, the Court takes judicial notice of the direction of Harty Athletic Complex and its proximity to 1501 East Hadley Avenue and the Academy using Google Maps data.

Sanchez disputes Baker's assertion and states: "[t]here were no active baseball games being played on those field[s,]" and "[t]here were no participants remaining on those fields." (*See* Doc. 37-3 ¶¶ 8–9.) The Court credits Baker's account for the following reasons. First, soon after Sanchez ran from his truck, an unidentified speaker on the radio tells Savage that "we got a whole bunch of people at the baseball field, someone get back there at Harty Field." (Savage Lapel Video at 2:40–2:44.) Second, the baseball field floodlights are easily identifiable throughout the video exhibits. (*See, e.g.*, *id.* at 13:58–14:01, 19:15–19:25.) Finally, as Savage leaves the Academy after Sanchez's arrest, he takes a right on Hadley Drive. (*See id.* at 24:32–25:50.) On Savage's right are the fields, floodlights, and a parking lot full of cars. (*Id.* at 25:50–26:18.) Thus, while there may not have been a baseball game *in progress*, it is clear that there were people at the complex at the time of the incident. The Court finds that Sanchez's contention is "blatantly contradicted by the record" and "no reasonable jury could believe it," thus the Court will "not adopt that version of the facts." *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 1347 (2019) (quotation omitted).

[4] Sanchez disputes that Baker "repeatedly" gave these commands on the basis that "Baker's affidavit . . . does not indicate the number of times he shouted or gave the command." (Doc. 37 ¶ 8.) This is insufficient to create a factual dispute, as Baker describes giving a number of commands in his affidavit. (Doc. 29-3 ¶¶ 15, 19, 23–24.)

that he did not attempt to conceal himself from Baker (Doc. 37-3 ¶ 10), Baker asserts that he was unable to clearly see Sanchez from his position due to nearby brush (*see* Doc. 29-3 ¶¶ 12, 16–17).[5]

It is here that the parties' versions of the encounter differ critically. Baker contends that he saw Sanchez's hand at the center of his waistband, inside of his clothing, and Baker feared that Sanchez had a weapon. (*Id.* ¶¶ 18, 21.) Sanchez asserts that he never made "a movement toward [his] waistband that would indicate the presence of a concealed weapon." (Doc. 37-3 ¶ 14.) Baker's lapel video did not activate during this encounter, but Defendants submitted lapel video footage from Officer Manny Baca, who arrived at the Academy seconds before Baker deployed Zeke. (Doc. 29-2-b (300_N_Hermosa (Baca)) ("Baca Lapel Video").) The video shows approximately four seconds of Sanchez slowly walking toward the officers before Zeke runs into the frame from the left. (*Id.* at 00:21–00:25.) While it is clear that Sanchez does not have his hands raised, the Court cannot confidently say that Sanchez's hands were anywhere near his waistband. (*Id.*) Because there is a genuine dispute of fact and Sanchez's assertion is supported by the record evidence, the Court accepts Sanchez's account on this point. *See Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 1347 (2019) (noting that courts accept the plaintiff's version of the facts at summary judgment if they find support in the record).

Baker released Zeke, who bit and held Sanchez on his upper arm and chest for approximately 35 to 37 seconds in total while Baker and two other officers handcuffed Sanchez. (Doc. 29-3 ¶¶ 24–25; Baca Lapel Video at 00:25–1:02.) The officers arrested Sanchez and took him to Memorial Medical Center for treatment of his wounds. (*Id.* at 1:02–1:56; Doc. 29-3 ¶ 23.)

---

[5] The parties quibble on this point, but the Court finds no conflict in the affidavits on the relevant facts: from Baker's perspective, Sanchez was at least partially concealed by brush due to their respective positions. (Doc. 29-3 ¶¶ 12, 16–17.) And Sanchez asserts that he did not attempt to hide. (Doc. 37-3 ¶¶ 10–11.) The video evidence, which shows Sanchez standing near a large bush while Baker is off-screen some distance away, could support both accounts. (*See* Doc. 29-2-b (300_N_Hermosa (Baca)) ("Baca Lapel Video") at 00:21–00:24.)

Sanchez was ultimately cited for aggravated driving while intoxicated, leaving the scene of an accident, driving with a suspended license, running a stop sign, assault on a peace officer, resisting or obstructing arrest, and speeding. (Doc. 29-1 ¶ 18.)

## II.    Legal Standards

### A.    Standard for Motions for Summary Judgment

"Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Halley*, 902 F.3d at 1143 (quoting *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018)). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" *Tanner v. San Juan Cty. Sheriff's Office*, 864 F. Supp. 2d 1090, 1106 (D.N.M. 2012) (quoting *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991)) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial." *Id.* (citing *Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Id.* (quotation and citations omitted). Instead, the non-moving party must come forward with "sufficient evidence on which the factfinder could reasonably find" in their favor. *Id.* (citations omitted). Evidence that is "merely colorable," *Anderson*, 477 U.S. at 249, or consists only of "[u]nsubstantiated allegations[,]" *McCoy*, 887 F.3d at 1044, is insufficient.

### B.    Qualified Immunity Standard

The Court reviews summary judgment motions based on a qualified immunity defense somewhat differently. *See Halley*, 902 F.3d at 1144. "When a defendant asserts qualified immunity

at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* (quoting *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011)). "A constitutional right is clearly established if it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). "A Supreme Court or Tenth Circuit decision on point or the weight of authority from other courts can clearly establish a right." *Id.* (citation omitted). "Generally, 'existing precedent must have placed the statutory or constitutional question beyond debate' to clearly establish a right." *Id.* (quoting *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018)). "The question is not whether a 'broad general proposition' was clearly established, but 'whether the violative nature of particular conduct [was] clearly established.'" *Id.* (quoting *Redmond*, 882 F.3d at 935) (internal quotation marks omitted).

"If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment . . . ." *Id.* (quoting *Koch*, 660 F.3d at 1238). And while the "Court must construe the facts in the light most favorable to the plaintiff as the nonmoving party, 'a plaintiff's version of the facts must find support in the record.'" *Koch*, 660 F.3d at 1238 (quoting *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009)).  If the plaintiff's "version of the facts is 'blatantly contradicted by the record, so that no reasonable jury could believe it,' then [the Court] 'should not adopt that version of the facts.'" *Halley*, 902 F.3d at 1144 (quoting *Thomson*, 584 F.3d at 1312).

**C.     Standard for Motions to Dismiss**

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in

the light most favorable to the plaintiff." *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015) (citation omitted). To survive a motion to dismiss, the complaint does not need to contain "detailed factual allegations," but it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

**III.     Count I: The Court will deny Defendants' motion on Sanchez's excessive force claim.**

Sanchez argues that Baker used excessive force against him by releasing his K-9 Unit, Zeke, despite the fact that Sanchez was peacefully surrendering. (Doc. 37 at 7–13.) The Court first considers whether Sanchez has shown a constitutional violation, then turns to whether the law was clearly established at the time of the arrest.

**A.     Sanchez has shown a constitutional violation.**

Defendants contend that Baker's decision to release Zeke was reasonable under the circumstances and he is entitled to qualified immunity. (Doc. 29 at 8–12.) The Court "analyze[s] whether the force used to effectuate an arrest violates an individual's Fourth Amendment rights under the 'objective reasonableness' standard of the Fourth Amendment." *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1220 (10th Cir. 2005) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). "A 'court assesses the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances.'" *Id.* (quoting *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002)). The *Graham* Court articulated factors that courts must "consider in assessing whether the force used was reasonable[, which] include: the alleged crime's severity, the degree of potential threat that the suspect poses to an officer's safety and to others' safety, and the suspect's efforts to resist or evade arrest." *Id.* (citation omitted); *see also Graham*, 490 U.S. at 396.

7

### 1.      Severity of Crime

The first *Graham* factor weighs against qualified immunity. Baker was aware that Sanchez

had, at most, evaded police, left the scene of an accident, and driven recklessly, all misdemeanors

under New Mexico law. *See* N.M. Stat. Ann. §§ 30-22-1, 66-7-202, 66-8-113. Even Savage

averred that he declined to pursue Sanchez into a neighborhood, because he "had no reason to

believe that [Sanchez] had committed a serious crime" that would "justify a high-speed pursuit

into a residential area . . . ." (Doc. 29-1 ¶ 8.) The Tenth Circuit has found that where a plaintiff

was arrested for a misdemeanor, the first *Graham* factor weighed in the plaintiff's favor. *Koch*,

660 F.3d at 1246–47; *see also Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008) (finding

that where officer arrested suspect for disorderly conduct, a petty misdemeanor, the crime was not

severe "and the amount of force used should have been reduced accordingly") (citation omitted).

In *McCoy*, on the other hand, the Tenth Circuit held that where the arresting officers knew that the

plaintiff was armed and had two hostages, this factor weighed against the plaintiff. 887 F.3d at

1049–50; *see also Thomson*, 584 F.3d at 1317 (finding officers were justified in releasing police

dog where plaintiff had "threatened his wife" with a gun "and fled their home[, and] officers knew

he was armed and in a residential neighborhood in the middle of the night"). Here, Baker knew

only that Sanchez had committed one or more non-violent misdemeanors, and this factor weighs

in Sanchez's favor.

### 2.      Degree of Threat

Viewing the facts in a light most favorable to Plaintiff, the second *Graham* factor also

weighs against qualified immunity. This factor examines "whether the suspect pose[d] an

immediate threat to the safety of the officers or others," *Pauly v. White*, 874 F.3d 1197, 1215 (10th

Cir. 2017) (quoting 490 U.S. at 396) (emphasis omitted), and "is undoubtedly the most important

and fact intensive factor in determining the objective reasonableness of an officer's use of force," *id.* at 1216 (quotation marks and citation omitted).

Baker argues that he reasonably believed Sanchez posed a threat to the safety of the officers and the people at the athletic complex. (*See* Doc. 29 at 10–11.) He compares this case to *Marquez*, where the release of a police dog was not found to be excessive because officers reasonably believed the plaintiff was a burglary accomplice, "was a danger to the public[,] and was willing to evade arrest." 399 F.3d at 1221. In *Marquez*, the plaintiff, a passenger in a car that initiated a high-speed chase with police, attempted to flee from officers after the car crashed. *Id.* at 1219. The Tenth Circuit held that the high-speed chase was "extended and reckless[,]" thereby "support[ing] the officer's] belief that failing to apprehend [the plaintiff] would endanger the public safety and allow the suspects to evade arrest." *Id.* at 1221. Baker argues that "[t]he circumstances and [Sanchez's] conduct are strikingly similar to those in *Marquez*." (Doc. 29 at 10.) The Court disagrees. Here, Baker had information that Sanchez committed one or more misdemeanors—not a residential burglary—and there was no reckless, high-speed police pursuit before Sanchez crashed his truck.

More importantly, unlike the plaintiff in *Marquez*, Sanchez was not attempting to flee at the moment Baker released Zeke. The Court must determine whether a reasonable officer would believe that there was a threat of "danger at the precise moment that [he] used force." *Thomson*, 584 F.3d at 1315 (quotation omitted). Baker asserts that he saw Sanchez's hand inside of his clothing at the center of his waistband and reasonably feared that Sanchez had a weapon, endangering the lives of the officers and the nearby public. But Sanchez has presented evidence "sufficient for a reasonable jury to draw a contrary inference." *See McCoy*, 887 F.3d at 1050. Sanchez avers that he never made "a movement toward [his] waistband that would indicate the

9

presence of a concealed weapon." (Doc. 37-3 ¶ 14.) And the video evidence, albeit shaky and blurry, can be construed to support Sanchez's version of the facts. (*See* Baca Lapel Video at 00:21–00:25.) The video footage shows that in the four seconds before Baker released Zeke, Sanchez was slowly walking in the direction of the officers. While Sanchez is clearly not complying with Baker's command to raise his hands, a reasonable jury could conclude that Baker should have realized that Sanchez posed no immediate threat of danger that necessitated the release of the police dog. Thus, this factor weighs slightly in Sanchez's favor.

### 3.     Active Resistance or Attempts to Flee

Finally, the third *Graham* factor also weighs slightly in Sanchez's favor on the record before the Court. Here, the Court considers whether the suspect resists arrest or attempts to flee. *McCoy*, 887 F.3d at 1051. The Tenth Circuit has "consistently concluded that a suspect's initial resistance does not justify the continuation of force once the resistance ceases." *Id.* (gathering cases). In *Wilson v. City of Lafayette*, for example, the plaintiff "actively resisted arrest by running over three-quarters of a mile from the officers, jumping over a barbed-wire fence, and failing to stop despite repeated commands." 510 F. App'x 775, 779 (10th Cir. 2013). "[A]t the moment of confrontation," the plaintiff had hesitated at a second fence and was reaching for his pocket despite the officers' commands for him to stop. *Id.* The Tenth Circuit found that the officer's use of a stun gun to subdue the plaintiff under the circumstances did "not *clearly* indicate that [the officer's] conduct was unlawful." *Id.* Here, Sanchez has demonstrated that he was neither actively fleeing nor reaching for a weapon, at least for the four seconds before Baker released Zeke. Indeed, the video shows Sanchez slowly walking toward the officers. Thus, the third *Graham* factor also weighs in Sanchez's favor.

On balance and on the record before the Court, all three *Graham* factors weigh in Sanchez's favor. Sanchez has shown sufficient facts to demonstrate a Fourth Amendment violation based on Baker's release of Zeke. While Sanchez had committed several misdemeanors, including evading an officer, he appeared to be calmly surrendering to the officers at the moment Baker released Zeke. Viewing the facts in Sanchez's favor, Baker had at least a short window of time to recognize that Sanchez was no longer fleeing and did not pose a danger to the officers or others, and to use a lesser amount of force to apprehend Sanchez.

**B.      The right at issue was clearly established at the time of the arrest.**

Having found a constitutional violation, the Court next considers whether Sanchez's Fourth Amendment right was clearly established at the time of the arrest. "The question . . . is whether the violation involved a clearly established right about which a reasonable person would have known." *Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Id.* (quotation omitted). "The plaintiff is not required to show, however, that the very act in question previously was held unlawful in order to establish an absence of qualified immunity." *Id.* (quotation omitted). Here, the Court must determine whether a reasonable officer would have known that releasing a police dog to bite a person who was suspected of only non-violent misdemeanors, who did not pose an immediate safety threat, and who had stopped fleeing in an attempt to surrender, would violate that person's constitutional rights.

There is no Tenth Circuit or United States Supreme Court case directly on point. Several cases from other circuits have, however, helped define the contours of the right to be free from excessive force in similar situations. In *Priester v. City of Riviera Beach, Florida*, an officer and

his police dog were searching for a suspect in a commercial burglary, where approximately $20 worth of food was stolen. 208 F.3d 919, 923, 927 (11th Cir. 2000). Priester was lying down in a canal when the officer shined a light on him. *Id.* at 923. Priester stood up and put his hands in the air. *Id.* The officer ordered him to get back down or he would release his dog. *Id.* Priester asked why, and the officer repeated his order. *Id.* Although Priester complied, the officer released the dog anyway, allowing the dog to bite Priester for two minutes. *Id.* at 923, 925. The Eleventh Circuit upheld the jury's finding that the officer violated Priester's Fourth Amendment right to be free of excessive force. *Id.* at 927. The court noted that Priester did not pose an immediate safety threat and was not attempting to flee or resist arrest at the time the officer released the dog. *Id.* The same is true here. Viewing the evidence in the light most favorable to Sanchez, Sanchez did not pose a safety threat, and he was not trying to flee or resist arrest when Baker released Zeke.

In *Chew v. Gates*, an officer pulled Chew over for a traffic violation. 27 F.3d 1432, 1436 (9th Cir. 1994). Chew stopped the car, fled on foot, and hid in a scrapyard. *Id.* The officer discovered that Chew had three outstanding warrants for his arrest and called for help. *Id.* Another officer and his police dog joined the search, searching for almost two hours before the dog found Chew hiding. *Id.* Chew attempted to surrender and asked the officer to restrain the dog, but the dog bit him. *Id.* The Ninth Circuit emphasized that there was no "articulable basis [to believe] that Chew was armed or that he posed a threat to anyone's safety." *Id.* at 1441–42 (citation omitted). The court found that the other two "*Graham* factors cut in favor of the [officers], but only slightly." *Id.* at 1442. It noted that the officers knew that Chew had three outstanding felony warrants, which "are not to be taken lightly[,]" but they did not know what "*type* of felony for which Chew was wanted, [so] the existence of the warrants [was] of limited significance." *Id.* And while Chew was not actively fleeing, he was still attempting to evade arrest by hiding in the scrapyard. *Id.*

12

Regardless, the court noted that the facts did not show that "the police were forced to make 'split-second judgments' in circumstances that were 'rapidly evolving'" due to the length of time the officers searched before finding Chew. *Id.* at 1443 (quoting *Graham*, 490 U.S. at 397). Ultimately, the Ninth Circuit found that "the question of the reasonableness of the decision to use the force involved" should be submitted to a jury. *Id. Chew* is notable due to the fact that the driver, like Sanchez, fled from a traffic stop. Unlike Sanchez, who was calmly surrendering before Baker released Zeke, Chew was still attempting to evade arrest. *See also Cooper v. Brown*, 844 F.3d 517, 521–23 (5th Cir. 2016) (officer who allowed police dog to bite plaintiff for one to two minutes not entitled to qualified immunity, where plaintiff had been pulled over on suspicion of driving under the influence, fled on foot, and hid in a residential neighborhood, but there was no evidence that he was a safety threat and he did not resist arrest once found).

In *Rainey v. Patton*, an officer initiated a traffic stop for a minor traffic infraction. 534 F. App'x 391, 392–93 (6th Cir. 2013). The driver (Rainey)—a woman the officer had encountered during a domestic call only minutes before and who was not known to be a safety threat—did not immediately stop on the street, but instead drove to a nearby parking lot and drove around until she found a place to park. *Id.* at 395. The officer ordered Rainey to get on the ground. *Id.* Rainey did not initially comply, but she was on the ground by the time the officer brought his leashed police dog over. *Id.* The Sixth Circuit noted that "cases granting qualified immunity to the officer highlight the importance of facts establishing that a suspect has failed to surrender or has yet to be apprehended and has been given the opportunity to avoid an encounter with a dog before its employment." *Id.* at 397. "When such facts have not been present, use of a police canine has been deemed unreasonable." *Id.* (citing *White v. Harmon*, 65 F.3d 169, at *3 (6th Cir. 1995)). But "it would be clear to a reasonable officer that employing a police dog against an unarmed suspect

detained on the basis of a traffic offense, who was on the ground and not attempting to flee, would constitute excessive force." *Id.* The Sixth Circuit found that the officer's decision to employ the police dog was not necessary to detain Rainey and qualified immunity was not warranted. Baker was, of course, faced with a tenser situation than that in *Rainey*. But like the officer in *Rainey*, Baker had no reason to think Sanchez posed a safety threat and he appeared to be surrendering.

*Priester*, *Chew*, and *Rainey* all stand for the proposition that even though a suspect may initially flee or resist arrest, an officer should know that the amount of force employed must decrease when it is clear that the suspect decides to surrender. This is especially true where the arrestees are not suspected of felonies (as in *Priester* and *Rainey*) or violent crimes (as in *Chew*), and where the suspects do not pose an immediate safety threat (as in *Priester*, *Chew*, and *Rainey*). *See also Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007) (holding that when an arrestee is suspected of committing a misdemeanor, this fact 'reduces the level of force that was reasonable for [an officer] to use')); *Landon v. City of North Port*, 745 F. App'x 130, 131–33, 136 (11th Cir. 2018) (officer who released police dog to bite plaintiff was not entitled to qualified immunity where the officer knew the man was suicidal and had cut himself with a knife, but when the officer found him he was laying on the ground and did not pose a safety threat); *cf. Wilson*, 510 F. App'x at 779 (officer who used a stun gun on an arrestee was entitled to qualified immunity where suspect had fled from officers, paused at a fence, and was reaching into his pocket despite commands to stop); *Becker v. Efreich*, 821 F.3d 920, 927–28 (7th Cir. 2016) (officer not entitled to qualified immunity where he continued to let his police dog bite a suspect after the officer had put the suspect on the ground, put his knee on the suspect's back, and was handcuffing him). Although the facts of these cases are not identical to those here, they are sufficiently analogous to define the contours of the right at issue in Sanchez's arrest. Based on the principles articulated in

14

*Priester*, *Chew*, and *Rainey*, it would be clear to a reasonable officer that releasing a police dog to bite a suspect who was detained on the basis of non-violent misdemeanors, who did not pose an immediate safety threat, and who had attempted to evade arrest but who had surrendered and was slowly approaching the officers, would constitute excessive force.

In sum, the Court finds that qualified immunity does not apply to Baker's decision to release Zeke, which violated Sanchez's clearly established right to be free from excessive force under these circumstances. Moreover, because there is a genuine dispute of fact regarding whether Sanchez posed an immediate safety threat, summary judgment is precluded.

## IV.   Count II: The Court will grant Defendants' motion on Sanchez's municipal liability claim.

Sanchez next claims that the City is liable under § 1983 for retention of Baker, because he has exhibited a pattern of using excessive force against arrestees. (*See* Compl. ¶¶ 64–73; Doc. 37 at 13–14.) To establish municipal liability under this theory, a plaintiff must demonstrate: (1) a policy or custom exists; (2) there is "a direct causal link between the policy or custom and the injury alleged;" and (3) "that the . . . action was taken with deliberate indifference as to its known or obvious consequences." *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (quotation marks and citations omitted).

### A.   Sanchez fails to demonstrate a municipal custom.

Sanchez argues that the City has a custom of retaining Baker despite the fact that he has been named as a defendant in at least four additional federal cases involving excessive force claims, three of which led to a jury award or a settlement.[6] (Doc. 37 at 13–14.) "In order to establish

---

[6] In the fourth case, Baker and two other officers responded to a call that the plaintiff (Perea) was unconscious in a car. *Perea v. City of Las Cruces*, No. 13-cv-0561 GBW/LAM, Compl. ¶¶ 4–8 (D.N.M. June 17, 2013). Baker tased Perea three times in the officers' attempt to get him out of the car. *Id.* ¶¶ 10–11. The jury found for the defendants and against Perea on all counts, including a count of excessive force. *Perea*, Final J. (D.N.M. Aug. 14, 2014).

a custom, the actions of the municipal employees must be 'continuing, persistent and widespread.'" *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (quotation omitted). "In attempting to prove the existence of such a 'continuing, persistent and widespread' custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Id.*

While Baker has been the subject of three excessive force suits that resulted in awards for the plaintiffs, the circumstances of those suits are significantly different from those here. In *Hernandez ex rel. Estate of Medrano v. Frias*, Baker and another officer shot and killed a suspect who they knew was attempting "suicide by cop." No. 10-cv-0351 JB/LAM, 2011 WL 1127882, at *2 (D.N.M. Mar. 15, 2011). After the court denied the officers' motion to dismiss an excessive force claim stemming from the incident, the officers settled with the plaintiff. *See* 10cv0351, Order Granting Am. Mot. to Approve Settlement (D.N.M. May 27, 2011). In *Provencio v. Baker*, Baker and another officer threw a substantially smaller female to the ground, each officer put a knee on her, and they handcuffed her. No. 12-cv-0912 KG/WPL, Compl. ¶¶ 9–17, 20–60 (D.N.M. Aug. 28, 2012). The officers had approached the woman because someone reported that she was smoking marijuana in her car, and they arrested her after she refused to let them into her house. *Id.* The parties settled the lawsuit before any dispositive motions were filed. *Provencio*, Order of Dismissal with Prejudice (D.N.M. Nov. 8, 2013). Finally, in *Beck v. Baker*, Baker threw a woman (Beck) "to the ground, slamming her face first into the rock landscaping" after she cursed at him with a raised voice about concerns she had with a neighbor. No. 14cv-0067 KG/WPL, 2016 WL 9447763, at *1–2 (D.N.M. Oct. 27, 2016). "Baker then purposely slammed her head into the frame of the police car as he put her inside." *Id.* at *2 (citation omitted). At trial, the jury found for the plaintiffs and against Baker, awarding $600,000 in compensatory damages and $1,000,000 in

16

punitive damages. *Beck*, 14cv-0067, J. (D.N.M. Feb. 16, 2017).

Sanchez argues that the City has "a custom of ignoring Officer Baker's continuing and persistent violent violations of the rights of unarmed and submissive citizens[.]" (Doc. 37 at 13 (citation omitted).) Yet Sanchez fails to offer evidence to show that the City ignored these violations, for example, by showing that the City failed to discipline and/or train Baker following the incidents. He also fails to show that the other plaintiffs were "similarly situated" or "mistreated by the municipality in a similar way." *See Carney*, 534 F.3d at 1274 (quotation omitted).

**B.      Sanchez fails to show a direct causal link between the alleged custom and his injury.**

Sanchez must also establish that the City's alleged custom was a direct causal link of his injury. To "establish the causation element, the challenged policy or practice must be 'closely related to the violation of the plaintiff's federally protected right.'" *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (quoting Martin A. Schwartz, Section 1983 Litig. Claims & Defenses, § 7.12[B] (2013)). "This requirement is satisfied if the plaintiff shows that 'the municipality was the "moving force" behind the injury alleged.'" *Id.* (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997)). The requirement to show this direct causal link is "stringent," and courts must "carefully test the link between the policymaker's inadequate decision and the particular injury alleged." *Brown*, 520 U.S. at 410, 415.

Sanchez argues that the City's retention of Baker after these prior lawsuits is the "moving force" behind Baker's 2017 violation of Sanchez's constitutional rights. Sanchez offers no authority to support a theory that three dissimilar excessive force claims over a ten-year period provide a direct causal link with the constitutional violation here. *See*, *e.g.*, *Barr v. City of Albuquerque*, No. 12-CV-01109-GBW/RHS, 2014 WL 11497833, at *7 (D.N.M. Aug. 22, 2014)

(finding that the plaintiff failed to show that DOJ findings regarding a police department's "alleged policy or custom of authorizing and/or not punishing the use of excessive force as a general matter" were "closely or directly linked to [the defendant officer's] decision to shoot" the plaintiff) (citations omitted). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Brown*, 520 U.S. at 405 (citations omitted). Sanchez has failed to meet this burden.

   C.   **Sanchez fails to show deliberate indifference.**

   Sanchez argues that the existence of past excessive force lawsuits establishes the City's deliberate indifference to Baker's conduct. (Doc. 37 at 13.) "A plaintiff also must show that the municipality's action or inaction resulted from 'deliberate indifference to the rights of the plaintiff.'" *Murphy v. Bitsoih*, 320 F. Supp. 2d 1174, 1195 (D.N.M. 2004) (quoting *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996)) (citing *Brown*, 520 U.S. at 407). "A plaintiff . . . may satisfy [this] standard by showing that 'the municipality ha[d] actual or constructive notice that its action or failure to act [wa]s substantially certain to result in a constitutional violation, and it nonetheless consciously or deliberately cho[se] to disregard the risk.'" *Id.* (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)).

   Again, however, Sanchez fails to establish that the plaintiffs in these lawsuits were similarly situated, such that the City would have had "notice that its action or failure to act [wa]s substantially certain to result in a constitutional violation" as a result of Baker's use of a police dog, "and it nonetheless consciously or deliberately cho[se] to disregard the risk." *See Murphy*, 320 F. Supp. 2d at 1195 (quotation omitted). On balance, Sanchez presents no genuine issue of fact regarding his municipal liability claim, and the Court will grant the motion on this issue.

18

V.    **Count III: The Court will deny Defendants' motion on Sanchez's excessive force claim under New Mexico state law.**

In Count III, Sanchez alleges a violation of his constitutional right to be free from excessive force under Article II, Section 10 of the New Mexico Constitution. (Compl. ¶¶ 74–82.) The parties agree that both state and federal law apply a reasonableness standard to excessive force claims. (Docs. 29 at 15; 37 at 14.) *See also Sisneros v. Fisher*, 685 F. Supp. 2d 1188, 1222 (D.N.M. 2010) ("New Mexico law applies a reasonableness standard, much like federal law, to excessive-force claims under the New Mexico constitution.") (citation omitted); *Benavidez v. Shutiva*, 350 P.3d 1234, 1247–48 (N.M. Ct. App. 2015) (treating plaintiff's federal and state law claims for excessive force in the same analysis); *New Mexico v. Ellis*, 186 P.3d 245, 257 (N.M. 2008) ("[G]enerally, the question of the reasonableness of the actions of the officer . . . is a question of fact for the jury.") (quoting *Alaniz v. Funk*, 364 P.2d 1033, 1035 (N.M. 1961)). Applying the reasonableness standard to Sanchez's state law claim, the Court will deny Defendants' motion for the same reasons it denied the federal law claim.

VI.   **Counts IV–V: The Court will dismiss Sanchez's claims for negligent use of equipment under the NMTCA.**

In Counts IV and V, Sanchez asserts that Baker and the City negligently used and/or issued equipment—in this case, a police dog. (Compl. ¶¶ 83–96.) Defendants surmise that Sanchez brings this claim under N.M. Stat. Ann. § 41-4-6, which waives immunity "for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings." N.M. Stat. Ann. § 41-4-6(A). (Doc. 29 at 16.) Sanchez agrees that he intended to bring these claims under § 41-4-6(A), but he offers no argument to show why these claims should remain. (Doc. 37 at 14–15.)

19

**A.      Sanchez's claim under § 41-4-6(A) against Baker fails.**

"Law enforcement officers may . . . be sued for negligence in 'the operation or maintenance of . . . equipment' under Section 41-4-6." *Smith v. Village of Ruidoso*, 994 P.2d 50, 57 (N.M. Ct. App. 1999). Sanchez makes no allegation to demonstrate that Baker *negligently* used Zeke. (Compl. ¶¶ 83–89.) Indeed, his excessive force claims are premised on an allegation that Baker *intentionally* released Zeke when a lesser degree of force was appropriate. Because the theory of recovery under this section must be premised on negligence, *see Smith*, 994 P.2d at 57, the Court will grant Defendants' motion and dismiss Sanchez's negligent equipment claim against Baker.

**B.      Sanchez's claim under § 41-4-6(A) against the City fails.**

Here Sanchez must show that the City's "negligent operation or maintenance [has] create[d] a dangerous condition that threatens the general public or a class of . . . users . . . ." *C.H. v. Los Lunas Schs. Bd. of Educ.*, 852 F. Supp. 2d 1344, 1352 (D.N.M. 2012) (citation omitted). Sanchez asserts in his Complaint that the City breached its duty to the general public when it "allowed an officer with a history of violent interactions with the public to use a K-9 unit while on patrol." (Compl. ¶ 93.) In his response brief, however, he does not address his negligent equipment claim against the City and, thus, apparently waives the claim. (Doc. 37 at 14–15 (addressing the claim under § 41-4-6 only as to Baker).) Even if he hadn't waived the claim, he alleges in his Complaint that the City owed "a duty to the general public, *specifically* Sanchez, to maintain and issue equipment in a reasonable manner." (Compl. ¶ 92 (emphasis added).) The New Mexico Supreme Court has held, however, that the purpose of § 41-4-6 is "to ensure the safety of *the general public*." *Archibeque v. Moya*, 866 P.2d 344, 348 (N.M. 1992). Thus, in Archibeque, a prison's negligence that put one specific inmate at risk of harm "did not create an unsafe condition on the prison premises as to the general prison population." *Id.* The same is true

here—even if Sanchez could show that the City was negligent in allowing Baker to use a police dog, the crux of his Complaint describes how Baker's actions were directed at Sanchez, not the general public. Accordingly, the Court will grant the motion and dismiss Sanchez's negligent equipment claim against the City.

**VII.   Count VI:[7] The Court will deny Defendants' motion on Sanchez's claim for battery under the NMTCA.**

Defendants acknowledge that "[l]aw enforcement officers may be subject to claims for battery in the course of their duties when their force is unlawful and unprivileged." (Doc. 29 at 17 (citing N.M. Stat. Ann. § 41-4-12).) They argue, though, that Baker did not commit a battery because he had "probable cause to arrest [Sanchez] and use reasonable force to arrest him." (*Id.* at 17–18 (citations omitted).) As the Court has found, however, Sanchez has sufficiently made out a claim for *excessive* force, which is not *reasonable* force. *See Cordero v. Froats*, No. 13-0031 JCH/GBW, 2015 WL 10990332, at *7 (D.N.M. Jan. 9, 2015) (noting that a claim for excessive force is "essentially a claim of . . . battery") (citation omitted).

An individual commits battery when "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results." *New Mexico v. Ortega*, 827 P.2d 152, 155 (N.M. Ct. App. 1992) (quoting Restatement (Second) of Torts § 18 (1965)). Sanchez has sufficiently demonstrated that Baker intended to cause a harmful contact by deploying Zeke, and that contact occurred. And because a genuine dispute of fact exists about whether that force was reasonable, the Court cannot grant summary judgment to Defendants on this issue. *See Murphy*, 320 F. Supp. 2d at 1203–04 (denying officers' motion for

---

[7] Both this count and the next are incorrectly numbered as Count IV in the Complaint. (*See* Compl. at 10.)

summary judgment on state law battery claim where a reasonable jury could find that the officers "acted unreasonably under the circumstances") (citation omitted).

## VIII. Count VII: The Court will grant Defendants' motion on Sanchez's claim for negligent hiring, retention, and training against the City under the NMTCA.

Finally, Sanchez asserts a claim for negligent hiring, retention, and training against the City. (Compl. ¶¶ 102–12.) In his response brief, however, he only argues that the City negligently *retained* Baker, thus waiving any claim he may have had for negligent hiring or training. (Doc. 37 at 16.) Negligent "retention is based on the employer's negligent acts or omissions in . . . retaining an employee when the employer knows or should know, through the exercise of reasonable care, that the employee is incompetent or unfit." *Lessard v. Coronado Paint & Decorating Ctr., Inc.*, 168 P.3d 155, 165 (N.M. Ct. App. 2007) (citations omitted). To prove a claim for negligent retention of an employee, Sanchez must show: (1) the City employed Baker; (2) the City "knew or should have known that" retaining Baker "would create an unreasonable risk of injury to" Sanchez; (3) the City "failed to use ordinary care in" retaining Baker; and (4) the City's negligence in retaining Baker was a cause of his injury. UJI 13-1647 NMRA; *Depaula v. Easter Seals, El Mirado*, No. 1:14-CV-0252 MCA/SCY, 2016 WL 6681182, at *9 (D.N.M. Mar. 31, 2016), *aff'd*, 859 F.3d 957 (10th Cir. 2017) (applying UJI 13-1647) (citation omitted).

Sanchez again argues that he has demonstrated a genuine factual issue on this claim by offering evidence that the City knew "Baker has a history of engaging in violent acts against non-threatening citizens[,]" and the City was aware that retaining "Baker would create an unreasonable risk of injury to suspects like" Sanchez. (Doc. 37 at 16.) As with Sanchez's federal retention claim, however, the Court finds that Sanchez fails to provide evidence that the City was negligent in training or reprimanding Baker after his previous lawsuits, or that the previous lawsuits put the

City on notice that Baker would use excessive force by releasing Zeke on an arrestee like Sanchez. The Court will grant Defendants' motion on this issue.

THEREFORE,

**IT IS ORDERED** that Defendants' Motion and Supporting Memorandum for Qualified Immunity and Summary Judgment (Doc. 29) is **GRANTED in part**. Defendants are entitled to summary judgment on Count II (the § 1983 municipal liability claim) and Count VII (the negligent retention claim), and these claims are dismissed. The Court also dismisses Counts IV–V (the negligent use of equipment claims).

**IT IS FURTHER ORDERED** that Defendants' Motion and Supporting Memorandum for Qualified Immunity and Summary Judgment is **OTHERWISE DENIED**.


_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE